UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
UNITED STATES OF AMERICA,

v.

EDWARD MEZGER,

Defendant.
---------------------------------------------------------X

**OPINION AND ORDER**

7:25-cr-00298 (PMH)

PHILIP M. HALPERN, United States District Judge:

Edward Mezger ("Mr. Mezger" or "Defendant") stands charged in a two-count Indictment of: (1) distribution of narcotics resulting in death in violation of 21 U.S.C. §§ 812, 841(a), and 841(b)(1)(C); and (2) possession with intent to distribute narcotics in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(B). (Doc. 39).

Presently pending before the Court is Defendant's motion made pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C) and (D) to: (1) suppress any evidence law enforcement obtained as a result of Mr. Mezger's alleged illegal seizure on November 15, 2023, including all evidence obtained derivatively as fruits of the allegedly illegal stop, and dismiss Count Two of the Indictment; (2) suppress any statements Mr. Mezger made during his alleged unlawful interrogation on November 15, 2023; and (3) if Count Two is not dismissed, sever Counts One and Two for trial. (Docs. 51 & 55).[1] Defendant also requested an evidentiary hearing. (*Id.*). The Government opposed the motion to suppress (Doc. 54),[2] and Defendant filed reply papers (Doc. 55).

---

[1] Defendant also submitted with his motion several exhibits, including bodycam footage from the November 15, 2023 traffic stop from Westchester County Department of Public Safety ("WCPD") Officer Eric Peterman and Sergeant Brandon Amlung.

[2] The Government also submitted with its opposition a video file of Defendant's post-arrest interview marked as Exhibit 1.

On April 22, 2026, the Court heard argument from the parties on the extant motion. (*See* Apr. 22, 2026 Min. Entry). Following oral argument, the Court scheduled an evidentiary hearing limited to three issues: (1) whether there was a traffic violation; (2) whether law enforcement officers had reasonable suspicion to extend the traffic stop to await the arrival of a dog sniff; and (3) whether Defendant's on-scene statements to law enforcement were made during a custodial interrogation.[3] The parties, in advance of the hearing, submitted correspondence to the Court setting forth their anticipated witnesses, testimony sought to be elicited, and exhibits expected to be introduced.

The Court held an evidentiary hearing and heard testimony on August 3, 2026, which was continued on August 4, 2026 for the parties to make closing statements.[4] The Government called to the stand Lieutenant Michael Cookingham of the Greenburgh Police Department and Sergeant Brandon Amlung of the WCPD. The Court reserved decision on the motion. (*See* Aug. 4, 2026 Min. Entry).

Based upon the parties' written submissions, the testimony adduced at the evidentiary hearing, and for the reasons set forth below, Defendant's motion is DENIED IN PART and GRANTED IN PART.

---

[3] "[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Cantoni*, No. 19-4358-CR, 2022 WL 211211, at *3 (2d Cir. Jan. 25, 2022) (quoting *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) (alteration in original)). In other words, a hearing was necessary in this case only to the extent there were "contested issues of fact that must be resolved in order for this Court to rule on [the] motion to suppress." *United States v. Holt*, No. 21-CR-00080, 2021 WL 5281366, at *2 (D. Conn. Nov. 12, 2021); *see also United States v. Merced*, No. 19-CR-00832, 2021 WL 5647827, at *11 (S.D.N.Y. Nov. 30, 2021).

[4] Citations to the hearing transcript will be cited herein as "Tr. __". Citations to the exhibits admitted at the hearing will be cited as "Hearing Ex. __".

## BACKGROUND

I. The Investigation into the Death of Ryan Arnott

a. Drug Sales Between Mr. Mezger and Mr. Arnott

Ryan Arnott passed away in January 2023 from a fatal fentanyl overdose. (Tr. at 9, 23). On or about March 28, 2023, the Director of Toxicology for the Westchester County Department of Laboratories and Research ("WCDLR") completed an analysis of Mr. Arnott's blood and urine and determined that fentanyl was present. (Doc. 2, "Compl." ¶ 13(d)). On or about May 8, 2023, the Deputy Medical Examiner for WCDLR determined that Mr. Arnott's cause of death was acute fentanyl intoxication. (*Id.* ¶ 13(e)).

Lieutenant Cookingham investigated the death of Mr. Arnott and the source of the narcotics that led to his death between late January 2023 and November 2023. (Tr. at 6, 9-10). On January 14, 2023, law enforcement officers recovered an iPhone in the home of Mr. Arnott. (Compl. ¶ 8; Tr. at 12). Mr. Arnott's cellphone contained text messages from the evenings of January 9 and 12, 2023, between Mr. Arnott and Mr. Mezger, indicating that Mr. Mezger delivered either heroin or fentanyl to Mr. Arnott. (Complaint ¶¶ 10, 12; Tr. at 16-22; Hearing Ex. 5). On January 9, 2023, Mr. Mezger texted Mr. Arnott after delivering the drugs that he "had a big deal right before" and did not "normally roll strapped." (Tr. at 18; Hearing Ex. 5 at 8). Lieutenant Cookingham testified that a "big deal" referred to a drug deal and "roll strapped" referred to carrying a firearm. (Tr. at 18). On January 12, 2023, Mr. Mezger texted Mr. Arnott that he was coming from Yonkers. (*Id.* at 21; Hearing Ex. 5 at 11). Lieutenant Cookingham testified that he thought it was significant that Mr. Mezger was coming from Yonkers because law enforcement considered Yonkers to be a source city where Westchester drug dealers sourced drugs. (Tr. at 21-22). Based on a review of the text messages between Mr. Mezger and Mr. Arnott, Lieutenant Cookingham believed that Mr.

Mezger was a drug dealer on "a pretty big scale" because he always had drugs and never had to buy them when Mr. Arnott ordered drugs. (*Id.* at 24).

b. <u>Crime Scene Photographs</u>

Lieutenant Cookingham reviewed photographs of the crime scene during his investigation. (*Id.* at 25-27). The photographs included a wax glassine envelope containing a red scorpion stamp and the word "Scorpion" underneath it next to a 2 of clubs playing card. (*Id.* at 28-29; Hearing Exs. 10 & 11). Lieutenant Cookingham researched the red scorpion stamp to see if there were any other fatal or nonfatal overdoses in the area related to this stamp. (Tr. at 29). Lieutenant Cookingham determined, in or around April 2023, that there existed multiple fatal and nonfatal overdoses with the same red scorpion stamp in the tristate area. (*Id.*).

c. <u>Call Detail Records</u>

During his investigation, Lieutenant Cookingham requested and reviewed call detail records for Mr. Mezger's cell phone wherein the date and number of calls from the most contacted individuals in his phone were compiled in a database. (*Id.* at 30). Lieutenant Cookingham analyzed the information to determine whether any known drug dealers were identified in Defendant's phone and whether there were any additional active investigations. (*Id.*). Lieutenant Cookingham concluded that some phone numbers corresponded with known drug dealers and that Defendant may have been contacting drug users and suppliers with burner phones. (*Id.* at 31-32).

d. <u>License Plate Readers and Surveillance</u>

Lieutenant Cookingham reviewed license plate readers ("LPRs") as part of his investigation. (*Id.* at 32). In January 2023, Lieutenant Cookingham established vehicle alerts for Defendant's vehicle and received an email when the vehicle passed an LPR camera. (*Id.*). Lieutenant Cookingham received LPR email notifications from Defendant's vehicle between late

January 2023 and November 2023. (*Id.*). Immediately following Mr. Arnott's death in January 2023, Defendant's LPR hits were erratic and did not follow a pattern. (*Id.* at 34). Defendant frequently made short trips to source cities such as Yonkers, the Bronx and New York City, and then returned to Westchester. (*Id.*). Short trips to source cities, in Lieutenant Cookingham's experience, can be indicative of narcotics trafficking because it is unusual to briefly visit a source city and then return home. (*Id.*).

Defendant's erratic travel pattern became predictable starting in late February 2023 until November 15, 2023. (*Id.* at 36-38). Defendant traveled to Yonkers via the Saw Mill River Parkway every morning, drove an elderly couple around in a Cadillac, and then returned home to Chappaqua in the afternoon. (*Id.* at 36, 79, 102-103). Between January and November 2023, surveillance of Defendant confirmed this activity. (*Id.* at 37). Finally, LPR data revealed that a white BMW driven by Defendant was 0.4 miles from Mr. Arnott's residence the night of January 12, 2023. (Compl. ¶ 11; Tr. at 45).

## II. The Traffic Stop

On November 15, 2023, Lieutenant Cookingham received an email alert from the LPR readers that Defendant's vehicle was traveling southbound on the Saw Mill River Parkway in Yonkers at 8:36 p.m. (Tr. at 37-38, 42). The alert, according to Lieutenant Cookingham, was out of the ordinary and indicative of Defendant's behavior immediately after the death of Mr. Arnott because he had not been traveling to Yonkers at night since late February 2023. (*Id.* at 38-39). By 9:15 p.m., Defendant's vehicle was at the Saw Mill River Parkway Marble Ave. exit ramp in the Town of Mount Pleasant. (*Id.* at 42-43; Hearing Exs. 3 & 3-A). The approximate 40-minute time period between the Defendant traveling southbound on the Saw Mill River Parkway at night and

arriving back in Pleasantville led Lieutenant Cookingham to believe that Defendant was picking up narcotics in Yonkers. (Tr. at 42-43).

Lieutenant Cookingham, as of November 15, 2023, believed that Defendant was involved in narcotics trafficking based on his review of: (1) text messages between Defendant and Mr. Arnott discussing narcotics transactions and Defendant's reference to possessing a firearm; (2) surveillance video from January 12, 2023 showing Defendant as the only individual entering and leaving Mr. Arnott's apartment; (3) crime scene photographs depicting a red scorpion stamp glassine envelope next to Mr. Arnott's body; (4) the medical examiner's report concluding that Mr. Arnott died of acute fentanyl intoxication; (5) call detail records of Defendant showing that he spoke to known drug users and drug suppliers; and (6) license plate reader data from January 12, 2023 showing Defendant's vehicle near Mr. Arnott's residence and from November 15, 2023 showing Defendant reverting back to his earlier pattern indicative of drug trafficking. (*Id.* at 45). Therefore, after receiving the LPR notification the evening of November 15, 2023, Lieutenant Cookingham contacted Sergeant Amlung of the WCPD for assistance in locating Defendant's vehicle and in stopping the vehicle if he observed a traffic violation. (*Id.* at 44-45, 88).

On November 15, 2023, Sergeant Amlung was working with Officer Peterman. (*Id.* at 117). Officer Peterman understood that the Defendant was associated with a heroin or fentanyl overdose and that he had displayed patterns consistent with narcotics trafficking. (*Id.* at 118-119). Officer Peterman reviewed the LPR notifications showing Defendant's vehicle traveling into Yonkers and then shortly returning to Mount Pleasant. (*Id.* at 120-121; Hearing Ex. 3). Officer Peterman believed that the short turnaround time for traveling to a large city was indicative of narcotics trafficking. (Tr. at 121).

Officer Peterman located and began observing Defendant's vehicle. (*Id.* at 122). Officer Peterman, while traveling on Quaker Road in the Village of Chappaqua, observed Defendant commit a traffic violation by crossing over the hazard markings, or the double yellow lines, in violation of N.Y. Vehicle and Traffic Law § 1128(d). (*Id.*). Quaker Road is a narrow residential road with a lane of traffic in each direction. (*Id.* at 122, 180). Officer Peterman initiated the traffic stop at approximately 9:30 p.m. and turned on his body camera. (*Id.* at 123-124, 126-127; Hearing Ex. 1)..[5] At approximately 9:30:15 p.m., Officer Peterman approached Defendant's vehicle from the driver's side and Sergeant Amlung later approached from the passenger side. (Tr. at 126-127; Hearing Exs. 1 & 2)..[6]

When Officer Peterman reached the vehicle, Defendant was eating French fries. (Hearing Ex. 1 at 9:30:20 p.m.). Officer Peterman told Defendant that the reason he stopped him was because "you came over this double yellow line like a little bit," to which Defendant replied, "Oh, sorry, I was eating." (Tr. at 127; Hearing Ex. 1 at 9:30:20 p.m.). Officer Peterman then asked Defendant for his license and registration. (Tr. at 128; Hearing Ex. 1 at 9:30:26 p.m.). Defendant responded, "I live right up here" and handed Officer Peterman his license only. (Hearing Ex. 1 at 9:30:41 p.m.). Officer Peterman asked Defendant where he was coming from and Defendant replied "McDonald's." (Hearing Ex. 1 at 9:30:43 p.m.). Officer Peterman inquired because it is a standard question and he also intended to establish a baseline to determine whether Defendant was going to be truthful or deceptive about his whereabouts. (Tr. at 128-129). Defendant also volunteered that his dad had passed away on Monday. (Hearing Ex. 1 at 9:30:49 p.m.). Officer Peterman then asked Defendant what he had in his hands and Defendant responded that they were

[5] Hearing Ex. 1 is Officer Peterman's bodycam footage from the November 15, 2023 traffic stop.

[6] Hearing Ex. 2 is Sergeant Amlung's bodycam footage from the November 15, 2023 traffic stop.

all PBA cards. (Tr. at 129; Hearing Ex. 1 at 9:31:03 p.m.). Defendant also mentioned that he hunted with some of the police officers. (Hearing Ex. 1 at 9:31:15 p.m.). Officer Peterman reviewed the PBA cards, explained that he was from the County police, and handed the cards back to Defendant. (*Id.* at 9:31:20 p.m.).

Officer Peterman again asked Defendant if he just got McDonald's and Defendant showed Officer Peterman the McDonald's bag and said his mom had not been cooking since his dad passed away. (*Id.* at 9:31:27 p.m.). Officer Peterman then asked Defendant again for his registration and Defendant handed over his registration and insurance card. (Tr. at 130; Hearing Ex. 1 at 9:31:38 p.m.). Officer Peterman also asked Defendant where he was before going to McDonald's and Defendant responded that he was at home. (Hearing Ex. 1 at 9:31:53 p.m.). Officer Peterman re-questioned Defendant about his whereabouts because he knew Defendant was in Yonkers and he wanted to see if Defendant's baseline story would change. (Tr. at 130).

After Defendant handed over his registration and insurance card, Officer Peterman asked him, "You alright man, you're trembling on me?" (Hearing Ex. 1 at 9:32:05 p.m.). Defendant responded, "Yeah, you know, I just lost my dad on Monday." (*Id.* at 9:32:08 p.m.). Officer Peterman testified that after he asked Defendant about his whereabouts prior to going to McDonald's he noticed that Defendant's right hand had a tremor and shook back and forth. (Tr. at 132). Officer Peterman further testified he narrated that Defendant's hand was trembling because the height of the body camera does not always capture some of the movements. (*Id.*). Officer Peterman viewed the hand trembling as a sign of nervousness. (*Id.*).

Officer Peterman also observed that the conversational tone of their interaction changed from multiple word answers to one-word answers which was a change in the baseline of their communication. (*Id.* at 130-131). For example, Defendant stated that he was "home" prior to

McDonald's. (Hearing Ex. 1 at 9:31:54 p.m.). Officer Peterman responded, "You just went down to McDonald's," to which Defendant replied, "yeah." (*Id.* at 9:31:57 p.m.). Officer Peterman then responded, "That was it," to which Defendant replied, "yeah." (*Id.* at 9:31:58 p.m.). Officer Peterman also observed that Defendant was shaking his head left and right while answering "yeah." (Tr. at 131). Based on his training, Officer Peterman viewed this response as a subtle or involuntary indicator that Defendant was being deceptive. (*Id.* at 114-115, 131-132, 196-197).

While Officer Peterman was holding Defendant's registration and insurance card, Defendant commented that he was upset about the loss of his father, who was his hunting and fishing partner. (Hearing Ex. 1 at 9:32:10-42 p.m.). Approximately three minutes into the traffic stop, Officer Peterman told Defendant to sit tight and went to speak to Sergeant Amlung. (Tr. at 134-135; Hearing Ex. 1 at 9:33:03). Officer Peterman muted his bodycam when discussing tactics with Sergeant Amlung. (Tr. at 135). Officer Peterman never turned the audio on his bodycam back on due to an oversight. (*Id.* at 136). Officer Peterman informed Sergeant Amlung he thought that Defendant was being deceptive and lying about his whereabouts and he wanted to get a K-9 sniff of the vehicle. (*Id.*). At this time, Officer Peterman had formed the opinion that Defendant had gone on a supply run to Yonkers to purchase narcotics. (*Id.* at 137). Officer Peterman based his opinion on the totality of the circumstances, including the LPR notifications showing Defendant traveling to Yonkers, a supplier city, and returning a short time later, the subtle and involuntary indicators that Defendant displayed when questioned about his whereabouts, and Defendant failing to mention traveling to Yonkers which Officer Peterman viewed as deceptive and suspicious. (*Id.*).

Lieutenant Cookingham had arrived on the scene within minutes of the traffic stop. (*Id.* at 46). Lieutenant Cookingham began speaking to Defendant as Officer Peterman left Defendant's vehicle to speak to Sergeant Amlung. (*Id.* at 49; Hearing Ex. 1 at 9:33:03). Lieutenant Cookingham

asked Defendant where he was coming from that night. (Tr. at 49). Defendant replied that he was home the entire night and he went to the McDonald's in Pleasantville to purchase two bundles of food. (*Id.*). Defendant also denied being in Yonkers. (*Id.* at 106). Based on the LPR data, Lieutenant Cookingham knew Defendant had traveled to Yonkers and was lying about his whereabouts. (*Id.*). Lieutenant Cookingham then decided to extend the traffic stop and to conduct an investigative stop to investigate potential drug trafficking. (*Id.*).

Lieutenant Cookingham asked Defendant to exit his vehicle for the safety of the officers. (*Id.* at 51-52). Detective Jeff Jee of the Dobbs Ferry Police Department brought Defendant to the back of the vehicle. (*Id.* at 53, 143). Detective Jee conducted a frisk and protective pat down of Defendant to search for weapons for the safety of the officers and the public. (*Id.* at 54, 139; Hearing Ex. 1 at 9:34:07).

Officer Peterman informed Defendant that he would be at the scene for a little while, a K-9 unit was coming, and he was not under arrest. (Tr. at 146-147). At approximately 9:42:40 p.m., Detective Jee told Defendant in a firm voice, "We're going to give you one more opportunity to clean yourself up and fess up right now, you can make this a lot easier on yourself by telling us what the fuck you were doing down there. Otherwise this is going to go a totally different route. Everybody's trying to be nice with you, but you're fucking basically lying to us. Right to our faces, like we're a bunch of fucking idiots. We know where you were tonight. Everybody has asked you the same question." Defendant responded, "I'm not calling you an idiot." Detective Jee then said, "But you are, but you are, cause you're basically telling us you haven't been to Yonkers all fucking day." (Tr. at 149; Hearing Ex. 2 at 9:42:40-9:43:08 p.m.).

At approximately 9:50 p.m., Officer DiRienzo of the WCPD and K-9 Liberty arrived at the scene. (Tr. at 153; Hearing Ex. 2 at 9:50:33 p.m.). At approximately 9:51 p.m., Defendant's car

alarm went off. (Tr. at 154, Hearing Ex. 2 at 9:51:15 p.m.). Officer Peterman asked Defendant for his car keys so the alarm would not be set off again. (Tr. at 155; Hearing Ex. 2 at 9:51:23 p.m.). Defendant asked to watch the dog sniff. (Tr. 156; Hearing Ex. 2 at 9:52:04 p.m.). Defendant repeatedly said, "I'm fucked," and that there were 50 grams in the trunk of his car, which Officer Peterman understood to mean either heroin or fentanyl. (Tr. at 157-158).

Officer Peterman then witnessed K-9 Liberty conduct the sniff where he alerted for the presence of narcotics. (*Id.* at 158-159). Defendant informed the officers that there was a black plastic bag in his trunk that someone had thrown in his car. (*Id.* at 160; Hearing Ex. 2 at 9:53:07-24 p.m.). Defendant also informed Detective Jee that "he did not mean no disrespect" and he attempted to shake Detective Jee's hand. (Hearing Ex. 2 at 9:53:41 p.m.). Detective Jee responded that "this is going to go a different way now." (Tr. at 160-161; Hearing Ex. 2 at 9:53:43 p.m.).

By the conclusion of the traffic stop, there were approximately 10 police officers and 5-6 police cars at the scene. (Tr. at 99, 198)..[7] During the traffic stop, Defendant was detained and not free to leave. (*Id.* at 101-102, 109, 214). Officer Peterman viewed the scene through the lens of narcotics interdiction rather than an ordinary traffic stop as the number of officers present was not typical for a standard traffic stop. (*Id.* at 213).

III. Arrest and Post-Arrest Statements

At approximately 9:54 p.m., Officer Peterman placed Defendant under arrest and handcuffed him once the drugs were found in his car. (*Id.* at 161). Following Defendant's arrest, Officer Peterman transported him to Westchester County police headquarters where he was

[7] The police officers included Lieutenant Cookingham, Officer Peterman, Sergeant Amlung, Detective Jee, Officer DiRienzo, Detective Brian Hennessey of the Dobbs Ferry Police Department, Officer Luis Llivisaca of the Sleepy Hollow Police Department, Detective Anthony Chiarlitti of the New Castle Police Department, Lieutenant Jamie Castiello of the Dobbs Ferry Police Department and an unidentified officer of the New Castle Police Department. (Tr. at 48-49, 51, 56, 96, 105).

interviewed by members of the Tarrytown Police Department after being read his *Miranda* rights. (Tr. at 161-163; Hearing Ex. 7). Defendant was charged with two counts of criminal possession of a controlled substance in the third degree, in violation of N.Y. Penal Law §§ 220.16(1) and 220.16(12), along with a violation of N.Y. Vehicle and Traffic Law § 1128(d), a violation for crossing road hazard markings. (Tr. at 163-164). Defendant also consented to the search of his cellphone. (*Id.* at 210-212; Hearing Ex. 8).

**ANALYSIS**

Defendant argues that he was stopped without reasonable suspicion on November 15, 2023; the stop was unlawfully prolonged; and he was questioned by law enforcement at the scene of the traffic stop without being advised of his right to remain silent. His motion seeks an order "(1) suppressing any evidence law enforcement obtained as a result of Mr. Mezger's illegal seizure on November 15, 2023, and dismissing count two of the indictment; (2) suppressing any statements Mr. Mezger made during his unlawful interrogation on November 15, 2023; and (3) if count two is not dismissed, ordering separate trials on counts one and two." (Doc. 51 at 5)..[8]

I. Reasonable Suspicion for the Traffic Stop

An officer may briefly stop a vehicle when he or she has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)..[9] "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Prado Navarette v. California*, 572 U.S. 393, 397 (2014). Courts

[8] Citations to the parties' filings correspond to the pagination generated by ECF.

[9] Unless otherwise noted, all case quotations omit internal quotation marks, citations, alterations, and footnotes.

have repeatedly held that the standard for reasonable suspicion is "not high." *See United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014). A *Terry* stop may also be based on reasonable suspicion that the person "was involved in or is wanted in connection with a completed felony." *United States v. Hensley*, 469 U.S. 221, 229 (1985)..[10]

Courts have also held that officers may stop a vehicle, including for pretextual reasons, where there is reasonable suspicion that a traffic violation occurred. *See Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009) ("We have held repeatedly that a traffic stop based on a reasonable suspicion of a traffic violation comports with the Fourth Amendment."); *United States v. Dhinsa*, 171 F.3d 721, 724–25 (2d Cir. 1998) ("an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance"). "When an officer observes a traffic offense — however minor — he has probable cause to stop the driver of the vehicle." *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994).

Crossing over roadway markings is a traffic offense for which a person can be detained, even if the traffic offense is a mere pretext for making the stop. N.Y. Vehicle and Traffic Law § 1128(d); *Dhinsa,* 171 F.3d at 724-25. Officer Peterman credibly testified that Defendant committed a traffic violation on Quaker Road when he crossed over the hazard markings. (Tr. at 122). Specifically, Officer Peterman observed the front and rear driver side tires of Defendant's vehicle cross over the double yellow lines as he was making a right-hand turn. (*Id.*). Defendant states in his affidavit in support of his motion to suppress that he did not recall crossing a double yellow line and did not believe that he did cross a double yellow line. (Doc. 51, Ex. A at ¶ 2).

[10] The Government argues that reasonable suspicion existed on November 15, 2023 to stop Defendant because of his involvement in drug trafficking. (Doc. 54 at 17-19). Officer Peterman did not testify, however, that he was going to stop Defendant because of his suspected drug trafficking. Officer Peterman planned to pull Defendant's car over if he witnessed Defendant committing a traffic infraction. (Tr. at 173).

Notably, Defendant did not deny committing a traffic offense at the scene of the traffic stop. Officer Peterman told Defendant that the reason he stopped him was because "you came over this double yellow line like a little bit," to which Defendant replied, "Oh, sorry, I was eating." (Tr. at 127; Hearing Ex. 1 at 9:30:20 p.m.). Therefore, the Court finds that the WCPD officers had reasonable suspicion to stop Defendant for committing a traffic offense.

II. Reasonable Suspicion to Extend the Traffic Stop to Await a Dog Sniff

Defendant argues that even if there was reasonable suspicion for the traffic stop, the WCPD officers unreasonably prolonged the traffic stop "to investigate unrelated criminal activity for which they lack reasonable suspicion." (Doc. 51 at 18). "The Supreme Court has held that an officer may not unreasonably prolong a traffic stop in order to conduct an investigation unrelated to the reason for the stop. *United States v. Cuello*, 811 F. App'x 38, 40 (2d Cir. 2020) (citing *Rodriguez v. United States*, 575 U.S. 348, 354-57 (2015)). "However, where an officer develops reasonable suspicion of criminal activity during the course of the stop, the Fourth Amendment permits that officer to detain the suspect even beyond completion of the traffic investigation." *Id.* at 40 (citing *Rodriguez*, 575 U.S. at 358).

The Supreme Court has cautioned that a traffic stop may last no longer than is necessary to effectuate the purpose of the stop. *Rodriguez*, 575 U.S. at 354. "Authority for the seizure thus ends when tasks tied to the traffic infraction are--or reasonably should have been--completed." *Id.* "Therefore, officers may conduct certain ordinary inquiries related to a traffic stop, such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance, without independent reasonable suspicion of other crimes. However, tasks not related to the traffic mission, such as dog

sniffs or on-scene investigation into other crimes, are unlawful if they prolong the stop absent independent reasonable suspicion." *United States v. Gomez*, 877 F.3d 76, 88-89 (2d Cir. 2017).

It is undisputed that Officer Peterman made the decision to extend the traffic stop to await the arrival of a narcotics detection dog within approximately three minutes of the traffic stop. (Tr. at 134-136). Defendant contends that "three minutes after Mr. Mezger had been pulled over, Peterman had all the information he needed to write a traffic ticket and finish the encounter," although Defendant also argues that within those three minutes Officer Peterman "improperly prolong[ed] the stop by interrogating Mr. Mezger about unrelated topics like his travel history." (Doc. 51 at 20; Doc. 55 at 12-13).

Officer Peterman's brief questions to Defendant regarding his travel itinerary did not prolong the traffic stop. Officer Peterman asked Defendant where he was coming from as he was reviewing Defendant's license that he had just requested. (Tr. at 127-128; Hearing Ex. 1 at 9:30:43 p.m.). Thus, this question added no time to the traffic stop. The question regarding Defendant's travel history was also reasonable as this is a "standard question." Officer Peterman could plainly see the bag of food in Defendant's car, and Defendant just said he was eating. (*Id.*).

Officer Peterman again asked Defendant if he just got McDonald's less than one minute later. (Hearing Ex. 1 at 9:31:27 p.m.). At this time, Officer Peterman was reviewing Defendant's license and the PBA cards which Defendant had in his hands and that Officer Peterman requested to see. (Tr. at 193, 208; Hearing Ex. 1 at 9:31:00-9:31:36 p.m.). Once again, this question added no time to the traffic stop. After this colloquy, Officer Peterman asked Defendant for his registration a second time and Defendant handed over his registration and insurance card. (Tr. at 130; Hearing Ex. 1 at 9:31:38 p.m.). While reviewing the registration, Officer Peterman also asked Defendant where he was before going to McDonald's and Defendant responded that he was at

home. (Hearing Ex. 1 at 9:31:53-9:31:58 p.m.). Accordingly, the bodycam footage confirms that the brief dialogue during the traffic stop regarding Defendant's travel itinerary while Officer Peterman was reviewing Defendant's documents did not incrementally add any time to the stop and did not constitute "bonus time to pursue an unrelated criminal investigation." *Rodriguez*, 575 U.S. at 357; *see also United States v. Callison*, 2 F.4th 1128, 1131 (8th Cir. 2021) (rejecting argument that officer unlawfully extended traffic stop because the travel-related questions did not extend the length of the stop). These facts also differentiate the traffic stop from the stop cited by Defendant in *United States v. Gomez*, where the officer "spent much of the time of the stop, if not most of it, asking questions and executing searches related to the heroin investigation rather than conducting ordinary inquiries incident to the traffic stop." *Gomez*, 877 F.3d 76, 91 (2d Cir. 2017).

Even if Officer Peterman's travel-related questions incrementally added time to the traffic stop prior to the decision to extend the stop to await a dog sniff, such questions were permissible. *See United States v. Santillan*, 902 F.3d 49, 57 (2d Cir. 2018) (officers had reasonable suspicion to extend the traffic stop beyond eight minutes based, in part, on the defendant's inability to provide a clear answer as to where they had come from); *United States v. Terry*, No. 18-CR-00024, 2019 WL 2176330, at *15 (W.D. Pa. May 20, 2019) ("questions about a driver's travel plans are ordinary inquiries incident to a traffic stop") (citing cases), *aff'd*, No. 23-2675, 2025 WL 1303942 (3d Cir. May 6, 2025); *United States v. Campbell*, 970 F.3d 1342, 1356 (11th Cir. 2020) ("Generally, questions about travel plans are ordinary inquiries incident to a traffic stop."). Therefore, the traffic stop was not unlawfully prolonged within the initial three minutes of the stop when the tasks needed to issue a traffic citation were complete.

Defendant next argues that Officer Peterman lacked reasonable suspicion to extend the traffic stop beyond three minutes to await the dog sniff. (Doc. 51 at 21-22; Doc. 55 at 10-12). "A

pretextual stop and reasonable suspicion are not mutually exclusive; an officer may conduct a pretextual stop based on a traffic violation and then, in full compliance with *Rodriguez*, extend the stop if the officer develops reasonable suspicion based on the actions of a driver or passenger either (i) before the stop, or (ii) during traffic-related processing of the stop. But . . . an officer may not extend an otherwise lawful stop for non-traffic related purposes absent reasonable suspicion of another offense." *Gomez*, 877 F.3d at 93, n. 27.

An officer's reasonable suspicion of further criminal activity must be supported by "specific and articulable facts which, taken together with rational inference from those facts, provide detaining officers with a particularized and objective basis for suspecting legal wrongdoing." *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015). "The reasonable suspicion standard is not high and is less demanding than probable cause, requiring only facts sufficient to give rise to a reasonable suspicion that criminal activity may be afoot." *Cuello*, 811 F. App'x at 40. Courts must "look at the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene, whose insights are necessarily guided by his experience and training," in determining whether extending a traffic stop is justified by reasonable suspicion." (*Id.*). The totality of the circumstances "may be as consistent with innocence as with guilt." (*Id.*).

The WCPD officers had reasonable suspicion that Defendant was engaged in narcotics trafficking that justified them extending the traffic stop to await a dog sniff based on the totality of the circumstances known to the officers both prior to and during the traffic stop. Lieutenant Cookingham credibly believed that Defendant was involved in narcotics trafficking based on his review of: (1) text messages between Defendant and Mr. Arnott discussing narcotics transactions; (2) surveillance video from Mr. Arnott's apartment on January 12, 2023; (3) crime scene

photographs; (4) Defendant's call detail records showing that he spoke to known drug users and drug suppliers; and (6) license plate reader data from January 12, 2023 showing Defendant's vehicle near Mr. Arnott's residence and from November 15, 2023 showing Defendant reverting back to his earlier pattern in the investigation indicative of drug trafficking. (Tr. at 45). Officer Peterman knew that Defendant was associated with a heroin or fentanyl overdose.[11] and that he had displayed patterns consistent with narcotics trafficking, including his short turnaround time in traveling to a supplier city which was indicative of narcotics trafficking. (Tr. at 118-121).

During the traffic stop, Officer Peterman credibly observed the following, all of which Officer Peterman identified as indicators of nervousness, deception or suspicion: i) Defendant's right hand tremor; ii) Defendant's use of one-word answers in responding to questions; iii) Defendant's body movements; and iv) Defendant's failure to mention traveling to Yonkers. (*Id.* at 131-132, 137, 196-197). Officer Peterman also did not believe Defendant when he stated that he was home prior to picking up McDonald's because he did not believe that Defendant had traveled all the way down to Yonkers for McDonald's. (*Id.* at 133). Lieutenant Cookingham also knew that Defendant had lied to him about not being in Yonkers. (*Id.* at 49). Nervousness, an implausible explanation of the purpose of a trip, or a story that simply does not ring true are factors supporting reasonable suspicion. *See Santillan*, 902 F.3d at 57; *see also United States v. Zayas*, No. 22-CR-00178, 2022 WL 16737223, at *8-9 (S.D.N.Y. Nov. 7, 2022) (finding that narcotics investigative

[11] "Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001).

knowledge prior to the stop combined with nervous behavior of defendant supported reasonable suspicion and extension of traffic stop for K-9 search).

Defendant argues that he did not mislead Officer Peterman about his travel history since Officer Peterman never asked him whether he went to a McDonald's in Yonkers or Mount Pleasant. (Doc. 51 at 21). Officer Peterman credibly testified, however, that he did not believe that Defendant had traveled from his house in Chappaqua to Yonkers only to pick up McDonald's. (Tr. at 133). Defendant only later admitted during his post-arrest interview that he went to the McDonald's in Mount Pleasant and that he was also in Yonkers. (Tr. at 163). Nonetheless, a "determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

Defendant further argues that giving evasive answers about travel history or being in a neighborhood frequented by drug users is not, standing alone, a valid basis to prolong a traffic stop. (Doc. 51 at 21, Doc. 55 at 8). The Court does not disagree. As discussed *supra*, however, numerous factors in combination provided WCPD officers with reasonable suspicion of criminal activity to extend the traffic stop. Even if each individual factor, viewed in isolation, would not establish reasonable suspicion of criminal activity, the reasonableness of an officer's suspicion of criminal activity must be determined from the totality of the circumstances rather than by a piecemeal approach. *See Arvizu*, 534 U.S. at 273-74 (2002) (rejecting a "divide-and-conquer analysis" of evaluating factors regarding reasonable suspicion of criminal activity in isolation).

Accordingly, there existed reasonable suspicion to extend the traffic stop to await a dog sniff. Defendant argues that the fruits of the unlawful stop must also be suppressed, including physical drug evidence seized from his car, his statements at police headquarters, and the evidence obtained from his phone; and that Count Two of the Indictment must be dismissed. (Doc. 51 at 22-

24). Because the WCPD officers had reasonable suspicion to stop Defendant and to extend the traffic stop to await a dog sniff, there is no basis to suppress any of this evidence or to dismiss Count Two.

Detective DiRienzo's case report states that: (i) K-9 Liberty was acquired by the Westchester County Police in October of 2020; (ii) K9 Liberty completed a ten-week basic course of instruction in narcotics detection at the Westchester County Police Academy; (iii) in July of 2021, the Westchester County Police Department was certified by the New York State Division of Criminal Justice Service as a Police Narcotics Detection Canine Team for cocaine, crack cocaine, methamphetamines, ecstasy, and heroin; and (iv) K-9 Liberty will positively alert her handler to the presence of these narcotic odors by sitting. (*See* Doc. 51, Ex. G). K-9 Liberty alerted Detective DiRienzo for the presence of narcotics in Defendant's car. (Tr. at 159, Doc. 51, Ex. G). Following a search of the car, a black plastic bag was found in the trunk consistent with the packaging of narcotics, heroin and fentanyl. (Tr. at 161). Officer Peterman then placed Defendant under arrest. (*Id.* at 161). Therefore, there is no basis to suppress the narcotics found in Defendant's trunk which forms the predicate for Count Two in the Indictment.

Following Defendant's arrest, Officer Peterman transported him to Westchester County police headquarters where he was interviewed by members of the Tarrytown Police Department after he was read his *Miranda* rights. (*Id.* at 161-163; Hearing Ex. 7). Defendant also consented to the search of his cellphone. (Tr. at 210-212; Hearing Ex. 8). Therefore, there is also no basis to suppress Defendant's post-*Miranda* statements or the evidence obtained from Defendant's cellphone. There remains, however, the issue of Defendant's statements made at the scene of the traffic stop while Defendant was standing behind his car.

III. <u>Custodial Interrogation</u>

Defendant argues that his statements made at the scene of the traffic stop should be suppressed because they were provided prior to him receiving a *Miranda* warning. (Doc. 51 at 21). Defendant does not specify, however, which statements should be suppressed. On a motion to suppress statements, the defendant bears the burden of showing that he was subject to custodial interrogation. *See United States v. Pena*, 961 F.2d 333, 336 (2d Cir. 1992).

The government may not use, absent a warning, a statement elicited by the police during a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 448-50 (1966). For *Miranda* safeguards to apply, a person must both be "in custody" and subject to "interrogation." *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017). It is well-settled that a typical traffic stop is not "custodial" for *Miranda* purposes and is instead equivalent to a *Terry* stop. *Berkemer v. McCarty*, 468 U.S. 420, 339 (1984).

Two main, objective factors are used to evaluate whether a suspect was in custody for *Miranda* purposes: "whether: (1) a reasonable person in the defendant's position would have understood that he or she was free to leave; and (2) there was a restraint of freedom of movement akin to that associated with a formal arrest." *Santillan*, 902 F.3d at 60. The "free to leave" inquiry is a necessary, but not determinative first step. "The ultimate inquiry for determining *Miranda* custody . . . is that articulated by the Supreme Court in *California v. Beheler*: whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Newton*, 369 F.3d 659, 670 (2d Cir. 2004). "For the second step, relevant factors are whether the suspect is told that he or she is free to leave, the location and atmosphere of the interrogation, the language and tone used by the law enforcement officers, whether the subject is searched or frisked, and the length of the interrogation." *Id.* The Second Circuit also considers the

number of officers involved and whether handcuffs were used. *Santillan*, 902 F.3d 49 at 61. "This is an objective inquiry, and a suspect's subjective belief about his status 'generally does not bear on the custody analysis.'" *Id.* (quoting *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016)).

Routine traffic stops generally do not constitute custodial settings. *See Berkemer*, 468 U.S. at 440 (the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not in custody for the purposes of *Miranda*"); *Newton*, 369 F.3d at 669 (routine traffic stops do not constitute custodial detentions for purposes of *Miranda*); *United States v. Fernandez-Jimenez*, No. 03-CR-01493, 2004 WL 1598653, at *5 (S.D.N.Y. July 16, 2004) ("[a]lthough motorists do not feel free to leave, traffic stops are not a form of custodial interrogation because they are brief and public"). In addition, "[i]n the absence of actual arrest, an interrogation is not custodial unless the authorities affirmatively convey the message that the defendant is not free to leave, or that he is completely at the mercy of the police." *Familetti*, 878 F.3d at 60.

Defendant was not under arrest when he made the pre-*Miranda* statements at issue prior to his formal arrest. Nonetheless, the location and atmosphere of the traffic stop, the number of police officers and police cars present, the language and tone used by Detective Jee, and the length of the traffic stop differentiate this situation from a routine traffic stop and would lead a reasonable person to objectively conclude they were in custody for purposes of *Miranda*.

Defendant, while still in his vehicle at the start of the traffic stop, was not in custody at the time of Officer Peterman's initial questioning. Approximately three minutes into the traffic stop, after WCPD officers had reasonable suspicion to extend the traffic stop to await a dog sniff for the presence of narcotics, Lieutenant Cookingham asked Defendant to exit his vehicle for the safety of the officers. (Tr. at 51-52). Detective Jee brought Defendant to the back of the vehicle and

appropriately frisked Defendant to search for weapons for the safety of the officers and the public. (*Id.* at 53-54, 139, 143; Hearing Ex. 1 at 9:34:07).

Admittedly, however, this traffic stop was not ordinary and Officer Peterman looked at the traffic stop through the lens of an interdiction. (Tr. at 213). Defendant was never handcuffed during the traffic stop. (*Id.* at 107, 140). Defendant was detained from the start of the traffic stop until the conclusion of the traffic stop. (*Id.* at 101-102, 214). Officer Peterman testified he informed Defendant that he was not under arrest, although there was no testimony at what point during the traffic stop Officer Peterman made this statement and the statement was not made when the audio from the bodycam was turned on. (*Id.* at 147, 151). Defendant maintains that no one informed him that he was free to leave or that he could refuse to answer the officers' questions. (Doc. 51, Ex. A at ¶ 3).

The traffic stop occurred on a residential street at night with relatively few passing cars. While Defendant had some freedom of movement, during the traffic stop he was surrounded by approximately 10 police officers and 5 to 6 police cars which necessarily limited his movement. (Tr. at 99, 198). Although Defendant primarily spoke to only Lieutenant Cookingham, Officer Peterman, Detective Jee and Sergeant Amlung during the traffic stop, (*id.* at 100-102), the presence of an additional 6 police officers in the immediate vicinity and multiple law enforcement vehicles with flashing lights differentiate this traffic stop from a typical *Terry* stop.

In addition, the traffic stop was not brief. Officer Peterman arrested Defendant at 9:54 p.m., approximately 24 minutes into the traffic stop. (*Id.* at 161). Officer Peterman had informed Defendant that he would be at the scene "for a little while." (*Id.* 147). While waiting for the K-9 unit to arrive, Detective Jee also questioned Defendant in a firm manner replete with expletives,

accusing Defendant of lying and offering him an opportunity to "fess up." (Tr. at 149; Hearing Ex. 2 at 9:42:40-9:43:08 p.m.).

While both parties cite *United States v. Santillan* to support their viewpoint regarding the custodial nature of the traffic stop, or lack thereof, the Court agrees with Defendant that the non-custodial interrogation in *Santillan* is distinguishable. In *Santillan*, a WCPD officer observed multiple traffic infractions and pulled the defendant's car over on a busy highway in the early afternoon following a recent snowstorm. *See Santillan*, 902 F.3d at 53-54. The defendant and another occupant in the car were frisked, informed they were not in trouble or under arrest, and asked to sit uncuffed in a patrol car. (*Id.*). At this time, approximately 17 minutes had elapsed since the officers initiated the traffic stop. (*Id.* at 54). After receiving consent to search the car and finding plastic wrapping and different seat material covering the driver's seat and passenger seat, the officers requested a narcotics dog who found cocaine in the car. (*Id.* at 54-55).

The Second Circuit, in determining that the defendant was not subject to a custodial interrogation in *Santillan*, noted that the defendant was questioned in public view on the side of the road, he was never handcuffed, and weapons were never displayed. (*Id.* at 61). Although the defendant was frisked and directed to wait in the police car while the WCPD officer and two more officers who arrived later continued their investigation, he was told that he was not under arrest or in trouble. (*Id.*). Moreover, a reasonable person could observe three police officers interviewing two individuals on a snow-covered shoulder of a heavily trafficked highway who were placed in a patrol car for safety reasons. (*Id.*). Based on the circumstances, the stop in *Santillan* "bore a much greater similarity to a traffic stop or *Terry* stop than to the type of custodial interaction that would trigger the requirement of *Miranda* warnings." (*Id.*).

Unlike the defendant in *Santillan*, Defendant was questioned by at least four police officers on a residential street at night, there were approximately 10 police officers at the scene of the traffic stop with 5-6 police cars surrounding him, at least one police officer questioned him in an aggressive manner, and he was informed that he would be at the scene "for a little while." (Tr. at 147). Based on the totality of the circumstances, after Defendant was directed to exit his vehicle, frisked and further questioned, a reasonable person would objectively conclude they were in custody and subject to interrogation for purposes of *Miranda*.

Accordingly, the Court grants Defendant's motion to suppress any statements he made at the scene of the traffic stop following Detective Jee's frisk of Defendant at 9:35:45 p.m., until he was read his *Miranda* rights at Westchester County police headquarters.

## IV. Severance of Counts One and Two for Trial

Defendant argues that substantial prejudice would exist from jointly trying him on Counts One and Two because the crimes occurred ten months apart, the proof on Count Two is substantially stronger than Count One, and the circumstances surrounding Count One are substantially more inflammatory than Count Two. (Doc. 51 at 28). The Court disagrees.

Federal Rule of Criminal Procedure 8(a) permits joinder of offenses against a single defendant if the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Even when joinder is proper under Rule 8(a), however, Federal Rule of Criminal Procedure 14 provides that a court may grant severance "[i]f the joinder of offenses . . . in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government." Fed. R. Crim. P. 14. Motions to sever are "committed to the sound discretion of the trial judge." *United States v. Chang An-Lo*, 851 F.2d 547, 556 (2d Cir. 1988). To prevail on a

severance motion under Rule 14, however, "the defendant must show not simply some prejudice but substantial prejudice." *United States* v. *Sampson*, 385 F.3d 183, 190 (2d Cir. 2004); *see also United States* v. *Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984) (explaining that a defendant "shoulder[s] the difficult burden of showing that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

As the Second Circuit has explained, "[g]ranting separate trials under Rule 14 simply on a showing of some adverse effect, particularly solely the adverse effect of being tried for two crimes rather than one, would reject the balance struck in Rule 8(a), since this type of prejudice will exist in any Rule 8(a) case." *Sampson*, 385 F.3d at 190. Indeed, the Second Circuit has stated that "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States* v. *Rosa*, 11 F.3d 315, 341 (2d Cir. 1993). Even in those rare instances where a defendant establishes a high risk of prejudice, "less drastic measures - such as limiting instructions - often suffice to cure any risk of prejudice." *United States v. Schlegel*, 687 F. App'x 26, 28 (2d Cir. Apr. 13, 2017); *United States v. Davidson*, No. 24-448, 2026 WL 925462, at *3 (2d Cir. Apr. 6, 2026) (same); *see also Felder v. United States*, No. 14-CR-00546, 2021 WL 3537164, at *5 (S.D.N.Y. Aug. 10, 2021) ("[A]ny risk of spillover prejudice could easily and adequately be addressed through an instruction by the Court, which is standard in this district in any case involving multiple counts, that the jury consider the evidence as to each count separately.").

Defendant cannot overcome the difficult burden of demonstrating substantial prejudice from a single trial on Counts One and Two. The alleged inflammatory nature of Count One or the relative strength of the evidence on Count Two compared to Count One simply do not countenance

severance. Counts One and Two allege different incidents of narcotics distribution where the government represents that overlapping evidence supporting both counts will include "the defendant's communications, photographs from his cellphone, and his admissions." (Doc. 55 at 36).

Any prejudice due to the purportedly inflammatory nature of Count One or the relative strength of the evidence can be addressed with jury instructions directing the jury to consider each Count separately, that the government must carry its burden of proof as to each Count, and that the verdict on one Count should not control its decision as to the other Count. Accordingly, Defendant's request to sever Counts One and Two for trial is denied.

## CONCLUSION

The motion to suppress is DENIED IN PART and GRANTED IN PART. Defendant's motion to suppress is denied, except that any statements Defendant made at the scene of the November 15, 2023 traffic stop following Detective Jee's frisk of Defendant at 9:35:45 p.m. until he was read his *Miranda* rights at Westchester County police headquarters are suppressed.

A pretrial conference is scheduled for September 30, 2026 at 2:30 p.m. in Courtroom 520. The Court will separately enter an Order excluding time under the Speedy Trial Act through September 30, 2026. (*See* Doc. 72). The Clerk of the Court is respectfully directed to terminate the motion sequence pending at Docs. 51 and 72.

**SO ORDERED.**

Dated: White Plains, New York
September 25, 2026

Philip M. Halpern
United States District Judge